We'll call the case of the United States v. Van Pelt. Mr. Court, Robert Marley is on behalf of Mr. Van Pelt. Are you asking for any, to save your comments? Yes, thank you. I would ask for three minutes of rebuttal, sir.  Thank you. Viewing this case from some appellate objectivity, we think that the government has taken a little less in terms of the facts as it applies to the law. Having said that, I recognize the difficult test that we have in light of no objections having been raised and the standard of review in this matter. And I hope to be able to address that. But preliminarily, I'd like to suggest from a factual point of view, Mr. Van Pelt had two official positions when he was approached by Mr. Dweck. We informed on behalf of the government agent. One of them he had resigned. And during the period of time that I was on as a township committee man, and during the seven years or so before, he had been instrumental in making this Wartown Center under the laws of New Jersey give it special redevelopment rights so that it could be developed on a fast-track basis going forward in the future. Did he resign a week before, two weeks before he received the $10,000? The first meeting was on 12-4-08 with Mr. Dweck. He resigned on February 1, effective February 28. He received the money on February 22. So he's still holding the office when he receives the $10,000. He takes no affirmative action during that period of time. The action he takes is after he has resigned, he sets up a meeting with Mr. Mosca later on. It's either March or May. It's actually May 22, I think. And what does he do? At the township level, all he does is turn over to the support developer a request for a proposal, which is available to the public, and eventually makes an appointment to sit with the town. And so he has no ability to influence any decisions at that point in time. The more problematical, I think, issue is he's an assemblyman, and I think that's where the focus of the case is because what the government suggests and what Dweck is saying, what I want is you want to be on my team, you don't understand that I'm a Republican, I'm not a Democrat, I'm a Green team. And he concedes that that's not a Ralph Maeder Green team, that I understand you're talking about money. In his mind, criminal intent being informed by this, in his mind he says this is a developer. He's got to have money to do the project. There was a concern because he kept pressing Dweck for the plans. Can I talk to your engineer? Can I help you with this? Being on the team. Now the government says being on the team doesn't mean it, but the government says, oh, that obviously means being on the team is to influence getting the CAFRA application at the DEP, the state agency, to the top of the list. Now he does not disclose to Dweck, but he knows that he is at the top of the list because of this redevelopment process. The CAFRA goes to the top of the list. That's what happens. That's part of the advantages of going through this very expensive process where the town spends lots of money on the inside. So he becomes a consultant. He becomes a consultant and accepts the money. And that's the way he is viewing, and it's the criminal patent, but he's viewing his position, that he doesn't go to the DEP. He never deals with the state agencies. He never does anything further. In fact, what does he do? What he does is he's going back to Dweck and saying, come on, let me help. Now he's obviously somebody who's interested in development. He's spent his last seven years trying to do this, and he's got a hotline. He's got someone who can actually make this a reality. And so he falls for the bait. So all of this is going to the agent issue because you're conceding the jury instruction issue? I'm not conceding the jury instruction issue. Okay. I'm not conceding the jury instruction issue. Okay. With respect to 666, the government says, well, they say, solved. You read the charge as a whole. The judge gave the charge under 1951, the Hobbs Act, that says, quote, unquote, this should be an exchange for. Therefore, the jury should have known. The jury should have understood. I don't think in criminal law that we can say that, particularly in criminal law, that, well, we can assume elements of a crime because a jury can infer it from other, another charge. In other words, when you give a charge, you have to know the elements. You have to know the elements. And we say, the next element is Babini. And Babini raised the same issue of, quote, unquote. And this court recognized that the different circuits go different ways. I saw it as a non-presumption opinion and said, you didn't have to give it. And you've got circuits that go, what? You want us to do what the Eighth Circuit did in Red Zinn and what the Second Circuit did in Gallup? Yes. And maybe we should in Ruth someday, but as I read it, we're not playing out with Ruth. Am I wrong on that? You're not wrong on that. So how in the world could this court, on playing out of review, faced with a circuit where you've got the 8th, the 2nd, and the 4th on one side, and the 11th, and the 6th, and the 7th on another side, say that this was played out? By definition, it's not played out. By virtue of the circuits, but how in the world? I have to concede that that's a real problem. I guess from a practitioner's point of view, and maybe I'm not smart enough to figure it out, but if there's something out there that appears unfair, and other people would get convicted of under, because the model charge right now doesn't have that in it, isn't part of what a court is supposed to do, is to say, we'll fix that. Now, if it's unfair, and I'm not sure, I can see, I'm not sure that I figured out the way to do that under the circumstance, and I understand that's what happened in the, what I want to do is to go forward, because we've extensively briefed this matter, and I want to raise two issues that I think are important. I want to direct the court's attention to the insanity opinion by Justice Sotomayor in the Supreme Court, and this relates to whether you should require an excess between criminal activity and the federal funds. In this case, it doesn't appear to be any. In fact, he voted against the budget. I'm sorry. It doesn't appear to be any excess between the federal funds that New Jersey got that were at risk, and any of his actions. It doesn't, obviously, have the tiller foreclosed on anyone. I don't think the tiller forecloses the argument, because we need its distinguishing. It's a theft case, not a bribery case, and the theft involves stolen federal funds, which directly implicates the 666's core provision of protecting the integrity of the funds. I don't think that's the same thing here. And what I'm suggesting, I want just to quote one part of Justice Sotomayor's opinion, and I get it in the 104 in the Supreme Court, and it's on page 19, book 46, going on to the next page. We can literally dispose of this position to qualify it as a valid exercise of our core power. The statute must require proof of connection to federal money as an element of defense. When we simply do not presume that a constitutionality of the federal criminal statute is lacking, explicit provision of a jurisdictional hook, and there is no occasion that we consider the need for such a requirement, when we hear there is no reason to suspect enforcement of a criminal statute would extend beyond a legitimate, justifiable under Article I, Section 8 of the Spending Clause, I'm suggesting in this case what Justice Souter couldn't envision did happen, and I'm suggesting that one of the reasons that SABI was not successful, and that was a bribe of counsel on a development project in Minnesota, is it was a direct facial attack on the constitutionality. They're not making a direct facial attack on the constitutionality, so there are different principles that apply in terms of the review. But I think his language here is something we do have to seriously consider with respect to the 666. Now, the next thing you're going to say to me, and I'm looking for further arguments this morning, I'm looking for knockout punches. I understand the issues and the problem. The indictment in this case, which is at January 16, the end of the indictment on extortion, the Hobbs Act, says, during certain dates, Van Pelt, knowingly or nothingly, did attempt to obstruct the effectiveness of state commerce by extortion under color of official right. If we look at 1951, and we know that we can't go to the Commerce Clause, we know that that's with the cases that say, if it looks like, sounds like, if you think, it's Commerce Clause. I don't understand it, but that's what they say. I'm not suggesting you go there. But I raised this issue, and I think we've raised it in a fair bit of a way. What does the statute say? The statute says, from 1951A, whoever in any way, degree, obstructs, delays, or affects commerce, or a movement, an article, or commodity, by extortion or attempts or conspires to do so. But the charge in this case is saying, you're attempting to obstruct, delay, or affect commerce. That's not what it means. The case is talking about it. It means you attempt or conspire water, or extortion, or a commodity in commerce. So what I'm saying is that under this indictment of attempting to affect commerce, there's no way to attempt to affect commerce. It may be that you can affect commerce in the most thinly veiled way at the end. But how can you attempt to affect commerce? And so we suggest that that's another argument, a jurisdictional argument, as to why this condition should fail. Okay. We'll have you back on the box. Yes, sir. Mr. Saunders. May it please the Court. I'm Assistant United States Attorney Stephen G. Saunders, Ambassador to the United States to the committee on this matter. I'd like to start where my adversary left off, which is that there's no basis for the jurisdictional element being met in this case. And, again, that's point three of the defendant's brief. This is not plain error of view. It's a sufficiency challenge, essentially. And it runs headlong into not only Gennady, which is an outlawed decision of this Court, but, Judge Fischer, your recent presidential opinion on behalf of the Court in Manzo, specifically from that aspect of Gennady, that says if you attempt to affect interstate commerce through a broadway scheme, that's the undercut of official right. That's the language that wasn't read by my adversary. That's in the statute. If you attempt to do it, and your scheme, if successful, would have affected commerce, you've satisfied the jurisdictional element of the Hobbs Act. So I think that that claim is running square against some of the law of the circuit. If I can backtrack, and I'll go in reverse order, the argument that Mr. Van Koppel is not an agent, meaning 6662, 321, pardon me, has to fail because the statute defines an agent as someone who is an agent of the government, employee of the government. He doesn't dispute that he falls within that definition. So what he's actually doing is, in effect, trying to rearguard attack on Olin and Savoy and saying we have to have some proof of control over federal funds. So Congress already decided that if you are an agent of a local government and you engage in bribery or theft in your capacity, you are a threat to the federal funds that the state or local government receives. Is the resignation a red herring? Yes. The resignation is a red herring because that goes to, I think from what I understood of the first five minutes of my adversary's argument, I think he was trying to argue that there's some basis in the evidence to find that having a more robust quid pro quo requirement, you know, this is obviously point one claim, would it make a difference to the outcome of the case. But our entire case was premised on the official action he promised to take in his capacity as assemblyman. The fact that he resigned in his capacity as a mayoral councilman in my time is really a red herring. In this instance, it's a red herring because we wanted to paint this picture that Mr. Van Pelt was, when he was promising to take action in return for money, he was doing it at the local level, which would be okay. But I can point to at least two videotapes that are in evidence that we put before the court where he was promising to do things in his assembly capacity after he's taken the money. And even if he thought he was, and this is why I said even the consultant defense is a red herring, even if he thought he was acting as a consultant, it would still be illegal to take official action at the state level. Judge Hartley, you were here for the Camilo case. We had a Brown case, two very similar schemes where sitting state senators tried to cover up a Barclay scheme by papering it over with a consulting arrangement. And so calling it consulting is still not going to carry the day because what you're doing is promising to use your official influence in return for the money. Now, I'll just take a couple of quick minutes on point one issue, which is whether the 666 instruction was erroneous. The court has already recognized, and I think as the panel did in Valdivia case, I don't know if I would call it a circuits violence issue. I think there's been some problems with nomenclature. What does a quid pro quo mean? I think all circuits agree that to the extent bribery requires some sort of exchange, it certainly doesn't require a highly rigorous specific exchange where you verify the official act up front at the time you accept a court opinion. Defendants in student benefits cases are always making that claim because if that rule were correct, you could never prosecute student benefits bribery as bribery. You would have to have sat down and decided in advance which official act the public official is going to commit in return for the money. And all the courts have dropped it, I think in footnote, nine of our briefs uniformly agree that that's not required. To the extent an exchange is required, number one, we think these instructions sufficiently satisfy it because it says in connection with and intent to influence and the transaction at issue here, there's no dispute about there was only one. It was official assistance with the capital approval. And my final point on how I respond to something that I might have to say is that we don't argue in our brief that the extortion instructions show that there wasn't any error with respect to the bribery instruction. We are pointing out point three, which is they're going to explain their analysis to show that a bribery instruction could have changed the outcome of this case. We know to a certainty what a bribery instruction jury would have done in this case because the extortion conviction shows that when the jury was told, you have to find an exchange of opinion for a promised official action right down to 30. So we could satisfy the native standard that this were a preserved claim. We have evidence and antigo from the circuit, which both sustained such a claim and rejected a preserved claim there. So on plain error review, where they don't bear the burden of showing that the outcome of the case would have been different, they can't possibly show that it would have made a difference to the outcome when we know what the jury actually, in this case, actually found. If the court has any other questions from me, I'm happy to sit down. Any other questions? Thank you, Mr. Sanders. Thank you. I just have one hypothetical to pose. If a client, maybe his name is Van Pelt, comes to me and says, I'd like to pay you. I understand that you're going to argue an appeal before the third circuit. I understand that Judge Greenway is on that panel. And I'm going to pay you if we argue that appeal. Would you be able to influence the decision? And I say to him, you know, I know Judge Greenway. I've heard a case before where he remembers that he told me every time he gets into a golf cart he remembers because it was a proxy case which I lost. But I've tried the case with Judge Greenway. I've actually seen him at a federal board dinner. You know, I don't think a lot, and that's what this guy said to Dweck, but I'll take your appeal. Am I subject to criminal liability? And that's what the context of what I said from the Pelt objectivity point of view as to the facts, we have to be very careful. The government censors the juries before, right? Because there's a perfectly innocuous explanation here hypothetically. Influence, that's what lawyers do. They get paid to come up here and influence us. Why would you get paid to influence me? That's what I'm trying to tell you. There's also a perfectly nefarious potential in your argument. And that's, you know, I say I've got juries for it, right? It is, and that's why we have appellate courts when the juries and the judges will go around. Thank you so much. Thank you. We thank counsel for their arguments and briefs on this case, and we'll take the matter under advice.